**EFiled: Jul 22 2014 12:05PM EDT**
**Transaction ID 55766261**
**Case No. 8442-VCN**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MPT OF HOBOKEN TRS, LLC, a                 :
Delaware Limited Liability Company,        :
MPT OPERATING PARTNERSHIP, L.P.,           :
a Delaware Limited Partnership, and MPT    :
OF HOBOKEN REAL ESTATE, LLC,               :
a Delaware Limited Liability Company,      :
                                           :
      Plaintiffs-                          :
      Counterclaim Defendants,             :
                                           :
      v.                                   :      **C.A. No. 8442-VCN**
                                           :
HUMC HOLDCO, LLC, a New Jersey             :
Limited Liability Company, and             :
HUMC OPCO, LLC, a Delaware Limited         :
Liability Company,                         :
                                           :
      Defendants-                          :
      Counterclaim Plaintiffs.             :


## MEMORANDUM OPINION AND ORDER


Dated Submitted:  March 24, 2014
Date Decided:  July 22, 2014

Michael P. Kelly, Esquire, Andrew S. Dupre, Esquire, and Daniel J. Brown, Esquire of McCarter & English, LLP, Wilmington, Delaware; and D. Scott Funk, Esquire and Michael A. Ackal, III, Esquire of Gray Reed & McGraw, P.C., Houston, Texas, Attorneys for Plaintiffs-Counterclaim Defendants.

David P. Primack, Esquire of McElroy, Deutsch, Mulvaney & Carpenter, LLP, Wilmington, Delaware; Louis A. Modugno, Esquire of McElroy, Deutsch, Mulvaney & Carpenter, LLP, Morristown, New Jersey; and Thomas R. Ajamie, Esquire, Wallace A. Showman, Esquire, and Courtney Scobie, Esquire of Ajamie LLP, Houston, Texas, Attorneys for Defendants-Counterclaim Plaintiffs.

NOBLE, Vice Chancellor

The parties in this litigation formed and financed a Delaware limited liability company ("LLC") to acquire and operate the Hoboken University Medical Center (the "Medical Center"). The present dispute generally involves whether the LLC's members breached its operating agreement, a convertible note it issued, or both.

Plaintiff MPT of Hoboken TRS, LLC ("MPT Hoboken") and the other Plaintiffs[1] (collectively with MPT Hoboken, the "MPT Entities") bring claims for breach of contract, declaratory judgment, and attorneys' fees against Defendants HUMC Holdco, LLC ("Holdco") and HUMC Opco, LLC ("Opco," and together with Holdco, the "HUMC Entities"). In addition, the HUMC Entities assert counterclaims for breach of contract, fraud in the inducement, and misappropriation against the MPT Entities.

The parties have moved for judgment on the pleadings under Court of Chancery Rule 12(c) as to certain claims and one of the counterclaims. The MPT Entities seek judgment in their favor that: (i) Opco is required, under the convertible note, to make tax distributions to MPT Hoboken; and (ii) Holdco violated Opco's operating agreement, which vested management authority exclusively in a manager, by creating a board of directors with purported managerial rights. Conversely, the HUMC Entities seek dismissal of these claims, contending that: (i) they have cured any alleged defaults by making the disputed

---

[1] The other Plaintiffs are MPT Operating Partnership, L.P. ("MPT Operating") and MPT of Hoboken Real Estate, LLC ("MPT Real Estate").

1

tax distributions; and (ii) any purported violation of Opco's operating agreement is immaterial. The HUMC Entities also seek dismissal of the MPT Entities' allegations that they failed to use commercially reasonable efforts in a state regulatory approval process. Finally, the MPT Entities seek dismissal of the HUMC Entities' counterclaim for fraud in the inducement as barred by various contract provisions and for failure to plead fraud with particularity under Rule 9(b).

For the following reasons, the MPT Entities' motion is granted in part and denied in part, and the HUMC Entities' motion is denied.

## I. BACKGROUND[2]

A. *The Parties*

The MPT Entities are Delaware entities, each with its principal place of business in Birmingham, Alabama. Holdco is a New Jersey LLC with its principal place of business in Philadelphia, Pennsylvania, and Opco is a Delaware LLC based in Hoboken, New Jersey.

MPT Hoboken and Holdco are the sole members of Opco. Currently, MPT Hoboken owns 9.9% of the membership interests in Opco; Holdco owns the rest.

---

[2] The Court draws from the generally undisputed allegations of the MPT Entities' Verified Complaint (the "Complaint") and the HUMC Entities' responses in the Answer and Counterclaim (the "Answer" and the "Counterclaim," respectively), unless otherwise noted, for the relevant background facts.

The parties did not attach the governing documents to their pleadings. Nonetheless, the Court may consider those agreements and documents at the pleadings stage because they are integral to, and thereby incorporated into, the Complaint and the Counterclaim. *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69-70 (Del. 1995).

B. *The Letter Agreement*

MPT Operating and Holdco entered into the Letter Agreement in February 2011 to govern their relationship and the formation of Opco to acquire the Medical Center (the "Medical Center Transaction"). Briefly, in the Medical Center Transaction, MPT Real Estate would acquire the Medical Center real estate and lease it to MPT Hoboken. MPT Hoboken would then sublease the real estate to Opco, which would also acquire the Medical Center operating assets.

The Letter Agreement provided that Opco would be owned 25% by MPT Hoboken and 75% by Holdco.[3] It also contemplated that MPT Hoboken's 25% interest could initially be represented in a convertible debt instrument, provided that "the economic and other terms thereof shall be substantially the same as if an equity instrument was utilized."[4]

C. *The Purchase and Sale Agreement and the Lease Agreement*

The parties entered into the Purchase and Sale Agreement in May 2011 to effect the terms of the Medical Center Transaction. The Purchase and Sale Agreement provides, in part:

> Section 14.5 Entire Agreement; Modification. This Agreement, including the Exhibits and Schedules attached, and other written agreements executed and delivered at the Closing by the parties, constitute the entire agreement and understanding of the parties with

---

[3] Opening Br. in Supp. of Pls.' Mot. for J. on the Pleadings ("Pls.' Opening Br.") Ex. 1 (Letter Agreement § 1).

[4] *Id.* Attachment I, ¶ 1.

respect to the subject matter of this Agreement. This Agreement supersedes any prior oral or written agreements between the parties with respect to the subject matter of this Agreement. It is expressly agreed that there are no verbal understandings or agreements which in any way change the terms, covenants, and conditions set forth in this Agreement, and that no modification of this Agreement and no waiver of any of its terms and conditions shall be effective unless it is made in writing and duly executed by the parties.[5]

In November 2011, Opco and MPT Hoboken entered into the Lease Agreement through which Opco subleased the Medical Center real estate. The Lease Agreement provides, in part:

> Entire Agreement; Modifications. This Lease, together with all exhibits, schedules and the other documents referred to herein, embody and constitute the entire understanding between the parties with respect to the transaction contemplated herein, and all prior to contemporaneous agreements, understandings, representations and statements (oral or written) are merged into this Lease.[6]

These contract provisions are implicated by the HUMC Entities' counterclaim for fraud in the inducement.

D. *The Convertible Note*

Also in November 2011, MPT Hoboken and the HUMC Entities executed the Convertible Promissory Note and Agreement (the "Convertible Note"), the convertible debt instrument that represented MPT Hoboken's initial 25% interest in Opco. Attached to the Convertible Note was a form of the Limited Liability Company Agreement of HUMC Opco, LLC (the "Opco LLC Agreement"), which

---

[5] Pls.' Opening Br. Ex. 2 (Purchase and Sale Agreement § 14.5).
[6] Pls.' Opening Br. Ex. 4 (Lease Agreement § 37.4).

Holdco and MPT Hoboken would execute upon conversion of the latter's Opco debt into equity.

The Convertible Note provides for MPT Hoboken to receive a quarterly "Interest Payment,"[7] which is defined as the greater of the "Interest Rate" or the "Distribution Payment."[8] The Distribution Payment is defined as

> a payment equal to any distributions by the Company [*i.e.*, Opco] of cash or the Fair Market Value [of] any securities or other property that the Holder [*i.e.*, MPT Hoboken] would have received if the Holder held the number [of] Units representing the Full Conversion Percentage for each Payment Period. The Distribution Payment shall be recomputed for each subsequent Payment Period and subject to appropriate adjustment for any partial conversion by the Holder.[9]

The Full Conversion Percentage is effectively 25%, subject to adjustment to offset any partial debt-to-equity conversion by MPT Hoboken.[10] The Convertible Note also provides that MPT Hoboken "shall not have the status as a member of the Company by reason of the issuance or holding of this Note until the Units are issued upon a Conversion."[11]

E. *Opco Makes Certain Tax Distributions to Holdco*

In November 2011, Opco booked a "Gain on Bargain Purchase" and a corresponding "Tax Distribution Payable." Opco then made a tax distribution to Holdco, its sole member at the time, against the Tax Distribution Payable. The

---

[7] Pls.' Opening Br. Ex. 3 (Convertible Note § 3(a)).
[8] *Id.* § 1(f).
[9] *Id.* § 1(b).
[10] *Id.* § 1(e).
[11] *Id.* § 10.

MPT Entities contend that, under the terms of the Convertible Note, this tax distribution qualifies as a Distribution Payment (and was for an amount greater than the Interest Rate) such that MPT Hoboken was entitled to receive, as an Interest Payment, an amount equal to the tax distribution that it would have received if it were a 25% member of Opco.

## F. *The Opco LLC Agreement*

MPT Hoboken converted a portion of its Opco debt under the Convertible Note into a 9.9% membership interest in Opco in March 2012. At that time, MPT Hoboken and Holdco executed the Opco LLC Agreement.

Opco is a manager-managed LLC. The Opco LLC Agreement provides that the "General Manager" (and in certain circumstances, the "Special Manager") is to manage the business and operations of Opco.[12] The General Manager of Opco is Holdco. The Special Manager, which may assume certain powers (including the power to replace the General Manager) in the event of a "Major Default," is MPT Hoboken or its designee.[13]

Under the Opco LLC Agreement, Opco must distribute "Distributable Cash Flow" to its members pro rata with their membership interests. If there is sufficient Distributable Cash Flow, Opco must also make "Tax Distributions" to its members. The Opco LLC Agreement defines Tax Distributions as "cash in an

---

[12] Pls.' Opening Br. Ex. 5 (Opco LLC Agreement §§ 3.1, 3.2).
[13] *Id.* § 1.

amount sufficient for each Member to pay its federal, state and local income tax payments resulting from its Membership Interest in the Company."[14]

G. *The Board of Directors and the Bylaws*

Section 3.16 of the Opco LLC Agreement permitted Opco to form "advisory committees," provided that those committees did not have any governance or other managerial rights.[15] Any document or instrument regarding the formation of an advisory committee for Opco is subject to MPT Hoboken's prior review and written approval, which is not to be unreasonably withheld.

Recently, as alleged by the MPT Entities, Holdco caused Opco to establish the Board of Directors (the "Board"), which adopted the Bylaws granting to the Board purported managerial rights over Opco. The Bylaws provide that, "[e]xcept as otherwise provided in the Organizing Documents [*i.e.*, the Opco LLC Agreement] or these Bylaws, the business of the Company shall be managed by its Board of Directors."[16] MPT Hoboken allegedly did not review or give its written approval of the instruments establishing the Board or the Bylaws.

---

[14] *Id.* § 5.3.

[15] *Id.* § 3.16 ("The Members acknowledge that the General Manager intends to establish and maintain certain advisory committees for the Facility as may be required pursuant to the certificate of need approval issued to the Company by the Department of Health and Senior Services of the State of New Jersey, including, without limitation, a board of trustees and a community advisory group. All of such committees shall be advisory in nature only, and shall not have any governance rights or other managerial rights or authority with respect to the Company.").

[16] Pls.' Opening Br. Ex. 6 (Bylaws § 4.01) ("The Board is the governing body of the Company with duties and responsibilities that include providing resources to ensure the delivery and

7

As alleged by the HUMC Entities, the Board is currently comprised of eight members: three designees of Holdco, the mayor of Hoboken, New Jersey (or the mayor's designee), two designees of the City Council, the president of the Medical Staff, and the Chairman of the Medical Center's Community Advisory Group. The Holdco designees have three votes each, and the other designees have one vote each. Thus, the Holdco designees represent nine of the Board's fourteen votes. The Bylaws further provide that the Board must give Holdco at least thirty days' notice before any proposed act becomes final and effective, and that Holdco "reserves all rights and authority to (a) approve, modify, reject or return to the Board for further evaluation any action taken by the Board, and (b) to compel the Board to take action at the direction of the Member."[17]

The Board arrangement was allegedly required to receive approval of the New Jersey Department of Health and Senior Services ("DHSS").[18] It was also described in Opco's initial Certificate of Need application to DHSS. The HUMC Entities assert that changing this arrangement now would cause Opco to violate the terms of its DHSS application and other accreditation requirements.[19]

---

maintaining of quality patient care, patient safety, the charge, control and management of the property, business, affairs and financial management of the Company, the establishment of policy, promotion of performance improvement, quality review and utilization risk, management/safety, medical staff credentialing, and the provision of organizational management and planning.").

[17] *Id.*

[18] Countercl. ¶ 59.

[19] *Id.*

H. *MPT Hoboken's Notice to Convert the Remainder of its Opco Debt into Equity*

In May 2012, MPT Hoboken notified the HUMC Entities that it intended to convert the remainder of its Opco debt under the Convertible Note into equity. To increase its ownership interest in Opco from 9.9% to 25%, MPT Hoboken required DHSS approval. Accordingly, Opco submitted a new Certificate of Need application. Under the Convertible Note, the parties were required to use "commercially reasonable efforts" to secure DHSS approval.[20]

DHSS requested that Opco answer a follow-up questionnaire. These additional questions allegedly related to whether MPT Hoboken, as the Special Manager, would have any managerial or operational control over Opco in the event of a Major Default.[21] MPT Hoboken and the HUMC Entities were unable to submit mutually-agreeable responses to the DHSS questionnaire by the deadline, which meant that MPT Hoboken did not receive the approval necessary to convert its Opco debt into equity.

I. *Recent Developments outside the Pleadings*

The MPT Entities filed the Complaint in March 2013. Several days later, in April 2013, Opco apparently paid an amount equal to 25% of its earlier Tax

---

[20] Convertible Note § 4(d) ("Following the Initial Conversion and notice by the Holder to the Company and HUMC of any subsequent Conversion, the Parties shall use commercially reasonable efforts to secure the approval, as soon as reasonably practicable, of the Hospital's Regulators for the issuance of the remaining Units to which the Holder shall be entitled to acquire hereunder pursuant to such Conversion . . . including, without limitation, the approval by DHSS of any change to the Hospital's licenses, permits or certificate of need.").

[21] Countercl. ¶¶ 39-40.

Distributions to MPT Hoboken. This and similar tax distribution payments in October and November 2013 were allegedly made "under protest with a complete reservation of rights,"[22] as the HUMC Entities have sued to recover them in the Counterclaim. According to an affidavit from a purported member of the Opco Board, "[a]s a result of these payments, MPT Hoboken has now received 25% of the total tax distributions paid by Opco as of [January 14, 2014]."[23]

MPT Hoboken also notified the HUMC Entities in December 2013 of its intent to convert the rest of its Opco debt under the Convertible Note into Opco equity.[24] Since then, the parties have apparently restarted the Certificate of Need application process with DHSS.

## II. ANALYSIS

### A. *The Procedural Standard of Review*

The procedural standard of review for a motion for judgment on the pleadings under Rule 12(c) is similar to that for a motion to dismiss under Rule 12(b)(6).[25] The Court accepts the non-moving party's well-pled allegations as true and views all reasonable inferences in the non-moving party's favor. A party's Rule 12(c) motion for affirmative relief "may be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of

---

[22] *Id.* ¶ 24.
[23] Lawler Aff. ¶ 3.
[24] *Id.* ¶ 5.
[25] *See, e.g.*, *McMillan v. Intercargo Corp.*, 768 A.2d 492, 500 (Del. Ch. 2000).

law."[26]  Conversely, a motion to dismiss a claim under Rule 12(c) should be denied unless the non-moving party "could not recover under any reasonably conceivable set of circumstances susceptible of proof."[27]

B. *Contract Interpretation under Delaware Law*

"[J]udgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact."[28]  Here, the relevant contracts are all governed by Delaware law,[29] which "adheres to the objective theory of contract interpretation."[30]  "When the language of a contract is plain and unambiguous, binding effect should be given to its evident meaning."[31]  "A dispute over a contract term does not, on its own, render that term ambiguous."[32]  "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may

---

[26] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[27] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011); *see also Wallace ex rel. Cencom Cable Income P'rs II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1179-80 (Del. Ch. 1999) ("To award judgment on the pleadings in favor of the defendants, [the Court] must find that plaintiffs have either utterly failed to plead facts supporting an element of the claim or that under no reasonable interpretation of the facts alleged in the Complaint (including reasonable inferences) could plaintiff state a claim for which relief might be granted.").

[28] *Lillis v. AT&T Corp.*, 904 A.2d 325, 329-30 (Del. Ch. 2006) (citations omitted).

[29] *See* Letter Agreement § 8; Purchase and Sale Agreement § 13.1; Convertible Note § 12(a); Lease Agreement § 37.11; Opco LLC Agreement § 13.1.

[30] *Sassano v. CIBC World Markets Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008).

[31] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

[32] *Barton v. Club Ventures Invs. LLC*, 2013 WL 6072249, at *5 (Del. Ch. Nov. 19, 2013) (citing *City Investing Co. Liquidating Trust v. Continental Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)).

have two or more different meanings."[33]  "When the provisions in controversy are fairly susceptible of different interpretations[,] . . . the interpreting court must look beyond the language of the contract to ascertain the parties' intentions."[34]

C. *Whether a Tax Distribution Qualifies as a Distribution Payment*

### 1. The MPT Entities' Motion

The MPT Entities have moved for judgment on the pleadings that the term "any distributions" in the definition of Distribution Payment in the Convertible Note includes Tax Distributions as defined in the Opco LLC Agreement.  They contend that this is the only reasonable interpretation of the term "any,"[35] and they submit that it would be inappropriate for the Court to rewrite the Convertible Note for "any" not to include Tax Distributions.[36]  In opposition, the HUMC Entities contend that, in light of the other terms of the Convertible Note and the Opco LLC Agreement, the undefined "any distributions" can only be interpreted as not including Tax Distributions.[37]

The Court concludes that the term "any distribution" in the Convertible Note is ambiguous because it is reasonably susceptible to at least two different meanings.  It is reasonable to interpret "any" as an all-encompassing term, much

---

[33] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).
[34] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).
[35] Pls.' Opening Br. 15-17.
[36] Reply Br. in Supp. of Pls.' Mot. for J. on the Pleadings ("Pls.' Reply Br.") 3-6.
[37] Defs.-Counterpls.' Br. in Opp'n to Pl.-Counterdefs.' Mot. for J. on the Pleadings ("Defs.' Answering Br.") 3-6.

like "all."[38]  From this perspective, proffered by the MPT Entities, "any distributions" would include Tax Distributions.  But, it is also reasonable to interpret "any distributions," in light of the other terms of the Convertible Note and the Opco LLC Agreement,[39] not to include Tax Distributions because the latter were to compensate Opco members for income taxes solely due to their status as members.  That is, it is reasonable to construe the documents such that MPT Hoboken is only entitled to Tax Distributions based on income tax liability attributable to its membership interest in Opco, not for its debt that was convertible into a membership interest.  From this other perspective, as advocated by the HUMC Entities, MPT Hoboken would not be entitled to pro rata payments of the Tax Distributions made by Opco to Holdco for taxes based on Holdco's membership interest.

One interpretation may be more plausible than the other; however, at this stage, neither is unreasonable.  Because "any distributions" is ambiguous, there is an issue of material fact as to the meaning of Distribution Payments in the Convertible Note.  The pleadings do not present conclusive evidence of the parties'

---

[38] *See Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 80 A.3d 155, 158 (Del. Ch. 2013) ("[T]he only reasonable interpretation of the statute [8 *Del. C.* § 259(a)] . . . is that *all* means *all* as to the enumerated categories, and that this includes *all* privileges, including the attorney-client privilege.").

[39] *See E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein.  Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan.") (internal citations omitted).

intent. Thus, the MPT Entities' motion for judgment on the pleadings as to the interpretation of this term is denied.

## 2. The HUMC Entities' Motion

Separate from the issue of the proper interpretation of "any distributions," the HUMC Entities seek to dismiss the MPT Entities' claims that they are in default of the Convertible Note and other agreements for failing to make Tax Distributions to MPT Hoboken. They assert, based on the affidavit submitted outside the pleadings, that they have made the disputed distributions.[40] The MPT Entities, in response, contend that the submission of the affidavit should, under Rule 12(c), convert this motion for judgment on the pleadings into one for summary judgment under Rule 56, which would mean that they should have the opportunity to conduct discovery. They seek limited discovery of certain issues implicated by the affidavit, including whether all possible payments were timely made and whether they are entitled to interest for any late payments.[41] The HUMC Entities, for their part, insist that no discovery is necessary because the MPT

---

[40] Defs.-Counterpls.' Opening Br. in Supp. of their Mot. for J. on the Pleadings ("Defs.' Opening Br.") 10-11.

[41] Answering Br. in Opp'n to Defs.-Counterpls.' Mot. for J. on the Pleadings. ("Pls.' Answer Br.") 5-10. Counsel for the MPT Entities submitted an affidavit under Rule 56(f) to this effect. Funk Aff. ¶ 2. At oral argument, counsel recognized that it is likely that discovery would confirm that all possible payments were made. That said, counsel still seeks the opportunity to verify that issue in discovery. Tr. of Oral Arg. Cross Mots. for J. on the Pleadings ("Tr. of Oral Arg.") 26, 40.

14

Entities already have that kind of financial information under the Opco LLC Agreement.[42]

This Court "generally will not grant relief if the substance of a dispute disappears due to the occurrence of certain events following the filing of an action."[43] The Court recognizes that the purported payments by Opco, as asserted in the affidavit, could have rendered moot much of the MPT Entities' allegations related to Opco's failure to pay.[44] Nonetheless, it is procedurally improper, under Rule 12(c), for the Court to rely on this affidavit—a document extraneous to the pleadings—without first providing to the MPT Entities the opportunity to conduct limited discovery into whether MPT Hoboken was timely and fully paid by Opco.[45] That the MPT Entities may already have access to certain financial information under the Opco LLC Agreement does not change the Court's conclusion on this procedural issue.

The HUMC Entities' motion to dismiss these claims is denied.

---

[42] Defs.-Counterpls.' Reply Br. in Supp. of their Mot. for J. on the Pleadings ("Defs.' Reply Br.") 3-7.

[43] *Multi-Fineline Electronix, Inc. v. WBL Corp. Ltd.*, 2007 WL 431050, at *8 (Del. Ch. Feb. 2, 2007).

[44] The Court does not express a view on whether a payment made "under protest" cures a default.

[45] Ct. Ch. R. 12(c) ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.").

15

D. *Whether the Board and Bylaws Conflict with the Opco LLC Agreement*

The parties have cross-moved for judgment on the pleadings as to the MPT Entities' breach of contract and declaratory judgment claims that the Board and the Bylaws violate the terms of the Opco LLC Agreement and the Convertible Note. The MPT Entities seek judgment in their favor; the HUMC Entities seek to dismiss the claims.

It is axiomatic under Delaware law that a Delaware LLC is governed by its operating agreement.[46] Under the Opco LLC Agreement, Opco is to be managed by the General Manager (or, in certain circumstances, the Special Manager). Because the Bylaws may provide certain management authority to the Board, they may violate the Opco LLC Agreement.

1. The MPT Entities' Motion

The MPT Entities contend that the HUMC Entities' unilateral changes to the management structure of Opco, by endowing the Board with management authority beyond that of an advisory committee, are *per se* violations of the Opco LLC Agreement.[47] In response, the HUMC Entities insist that the Board is merely advisory because Holdco, the General Manager, retains full management authority

---

[46] *See, e.g.*, *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *8 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) (TABLE); *see also* 6 *Del. C.* § 18-402.
[47] Pls.' Opening Br. 23-27.

over Opco under the Bylaws. Thus, they argue, there is no functional distinction between the Opco LLC Agreement and the Bylaws.[48]

The Bylaws facially conflict with the Opco LLC Agreement: the latter vests exclusive management authority in the General Manager (Holdco), while the former vests certain managerial rights in the Board. That said, the Opco LLC Agreement expressly permits advisory committees under Section 3.16, so the facial conflict is not dispositive of this issue. Rather, the issue is whether the Board qualifies as an advisory committee.

In this context, the imprecise term "advisory committee" in the Opco LLC Agreement is ambiguous because it is reasonably susceptible to two interpretations.[49] The Board structure could fall within one reasonable meaning of advisory committee in that Holdco, as the General Manager, maintains its management authority of Opco under the Bylaws through its majority voting representation on the Board and its power to modify and compel any action of the Board. But, a governance structure requiring Holdco to compel the Board to act (or to modify the Board's actions) could be outside the bounds of what a reasonable interpretation of advisory committee would permit.

The pleadings and the incorporated documents do not contain dispositive evidence of the parties' intent in agreeing to the "advisory committee" term of the

---

[48] Defs.' Answering Br. 10-13.
[49] *See Rhone-Poulenc Basic Chems. Co.*, 616 A.2d at 1196.

Opco LLC Agreement. Thus, there is an issue of material fact—the meaning of advisory committee—which precludes granting the MPT Entities' Rule 12(c) motion for judgment in their favor.[50]

2. The HUMC Entities' Motion

The HUMC Entities assert that, because Holdco's three representatives control nine of fourteen votes on the Board, and because Holdco retains final approval of the Board's acts under the Bylaws, Holdco still exclusively manages Opco. Hence, they submit, there is no conflict with the Opco LLC Agreement.[51] Moreover, the HUMC Entities argue that this claim is not ripe because the MPT Entities have not alleged any current or imminent harm due to the existence of the Board or the Bylaws.[52] The MPT Entities, in response, argue that this declaratory judgment claim is ripe because there is a present dispute over the management of Opco; they also contend that the Board and its purported authority under the Bylaws are *per se* violations of the Opco LLC Agreement.[53]

This Court has the authority under 6 *Del. C.* § 18-110(a) to "hear and determine . . . the right of any person to become or continue to be a manager of a

---

[50] Because the HUMC Entities deny that the MPT Entities did not approve the Board and the Bylaws, Answer ¶ 33, there is a dispute of material fact that would preclude granting the MPT Entities' Rule 12(c) motion as to whether Holdco's allegedly unilateral creation of the Board and the Bylaws was a breach of Section 3.16 of the Opco LLC Agreement for failure to obtain MPT Hoboken's prior written approval.

[51] Defs.' Opening Br. 13.

[52] Defs.' Reply Br. 10-14; Defs.' Opening Br. 13-15.

[53] Pls.' Answering Br. 12-16.

limited liability company."[54]  To exercise its statutory authority[55] to hear a claim

seeking a declaratory judgment, the Court must find four elements:

> (1) It must be a controversy involving the rights or other legal
> relations of the party seeking declaratory relief; (2) it must be a
> controversy in which the claim of right or other legal interest is
> asserted against one who has an interest in contesting the claim; (3)
> the controversy must be between parties whose interests are real and
> adverse; (4) the issue involved in the controversy must be ripe for
> judicial determination.[56]

The dispute here over whether the Bylaws grant to the Board managerial rights

beyond that of an advisory committee places a cloud over the management of Opco

as a Delaware LLC.  For example, the Bylaws do not appear to contemplate how

Opco is to be governed in the event that MPT Hoboken exercises its power, under

certain circumstances, to remove Holdco as the General Manager of Opco.[57]  The

risk of future harm to the MPT Entities is sufficient to warrant resolution of this

claim now.[58]

Based on the allegations of the parties, the Court concludes that this dispute

is ripe for judicial determination.  But, for the reasons set forth earlier, an issue of

---

[54] *See also Feeley v. NHAOCG, LLC*, 2012 WL 966944, at *5 (Del. Ch. Mar. 20, 2012) ("Section 18-110 of the LLC Act grants this Court *in rem* jurisdiction to determine who validly holds office as a manager of a Delaware limited liability company.").

[55] *See* 10 *Del. C.* § 6501.

[56] *XL Specialty Ins. Co. v. WMI Liquidating Trust*,— A.3d —, 2014 WL 2199889, at *5 (Del. May 28, 2014) (quoting *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 479 (Del. 1989));

[57] Purchase and Sale Agreement § 3.8.

[58] *See KLM Royal Dutch Airlines v. Checchi*, 698 A.2d 380, 382 (Del. Ch. 1997) ("Determining whether the parties' dispute is ready for decision requires consideration of, *inter alia*, the present effects of the challenged conduct versus the future harm to be suffered by the plaintiff if resolution is delayed, the likelihood of a change in the factual circumstances, and the legal issues involved.").

material fact—the meaning of "advisory committee"—precludes granting the HUMC Entities' Rule 12(c) motion to dismiss.

E. *Whether the HUMC Entities Failed to Use Commercially Reasonable Efforts*

The MPT Entities claim that, in violation of the Convertible Note, the HUMC Entities failed to use commercially reasonable efforts to secure DHSS approval of MPT Hoboken's conversion of its remaining Opco debt into a membership interest. They assert claims for breach of contract and for a declaratory judgment. Specifically, the MPT Entities allege in the Complaint that the HUMC Entities failed to use commercially reasonable efforts by:

    a.    Insisting on mischaracterizing the management rights of MPT Hoboken, or lack thereof, under the LLC Agreement to DHSS;

    b.    Refusing to clarify the management rights of MPT Hoboken, or lack thereof, by amending the LLC Agreement . . . ; and

    c.    Refusing to allow MPT Hoboken to meet with or have any direct contact with DHSS . . . to clarify and explain the management rights of MPT Hoboken, or lack thereof.[59]

The HUMC Entities deny these allegations[60] and separately assert, in the Counterclaim, that MPT Hoboken sought to submit "false and misleading" answers to DHSS in violation of the Opco LLC Agreement.[61] As a result of their disagreements over how to answer various questions posed by DHSS, the parties

---

[59] *See, e.g.*, Compl. ¶ 27.
[60] *See, e.g.*, Answer ¶ 27.
[61] *See, e.g.*, Countercl. ¶¶ 42-43.

20

missed the deadline and thereby failed to obtain the approval necessary for MPT Hoboken to convert its Opco debt into equity.

The HUMC Entities seek dismissal of these claims, contending that the MPT Entities' allegations were rendered moot or are not ripe in light of the new application process with DHSS, which MPT Hoboken initiated in December 2013.[62] In opposition, the MPT Entities maintain that their claims relate to the earlier, unsuccessful application—not the ongoing approval process—and thus are neither moot nor unripe.[63]

"According to the mootness doctrine, although there may have been a justiciable controversy at the time the litigation was commenced, the action will be dismissed if that controversy ceases to exist."[64] The recently-initiated approval process does not moot the MPT Entities' claims because they relate to the prior application; the controversy continues to exist. In other words, that the parties are currently seeking DHSS approval does not prevent the MPT Entities from seeking damages or a declaratory judgment for the HUMC Entities' purportedly failing to use commercially reasonable efforts in the separate, unsuccessful approval process.

---

[62] Defs.' Reply Br. 7-9; Defs.' Opening Br. 11-13; Lawler Aff. ¶ 5.
[63] Pls.' Answering Br. 10-12.
[64] *Gen. Motors Corp. v. New Castle Cty.*, 701 A.2d 819, 823 (Del. 1997) (recognizing that this general rule has exceptions, including "situations that are capable of repetition but evade review or matters of public importance").

For this Court to issue a declaratory judgment, the dispute must be ripe.[65] A challenge to the current regulatory approval process with DHSS would not be ripe because any decision by the Court would be an advisory opinion on the parties' conduct during an ongoing approval process.[66] But, again, the Court's "common sense assessment" of this issue is that the MPT Entities' interest in seeking relief related to the prior approval process outweighs the possible benefit of postponing judicial review to allow the matter to develop with greater clarity.[67] The declaratory judgment aspect of this claim is not contingent on future developments; it is ripe.

The HUMC Entities' Rule 12(c) motion to dismiss these claims is denied.[68]

F. *Whether the HUMC Entities Properly Alleged Fraud in the Inducement*

In the Counterclaim, the HUMC Entities assert a claim for fraud in the inducement. Specifically, the HUMC Entities allege that, "[i]n the course of negotiating the HUMC transaction, MPT [*i.e.*, the MPT Entities] represented to Opco and Holdco that MPT did not intend to finance any transactions with Prime

---

[65] *XL Specialty Ins. Co.*, 2014 WL 2199889, at *5.

[66] *See Multi-Fineline Electronix, Inc.*, 2007 WL 431050, at *8 (quoting *Energy P'rs, Ltd. v. Stone Energy Corp.*, 2006 WL 2947483, at *7 (Del. Ch. Oct. 11, 2006)) ("Generally speaking, an action is not ripe for adjudication when it is 'contingent . . . [and requires] the occurrence of some future event before the action's factual predicate is complete.'").

[67] *See XL Specialty Ins. Co.*, 2014 WL 2199889, at *6.

[68] Separately, the Court notes that it may make sense to defer the resolution of this claim until the conclusion of the current application process, if for no other reason than to permit the parties (and thus the Court) to come to a more informed understanding of what commercially reasonable efforts in this context would require.

[Healthcare Services, Inc. ("Prime")] in New Jersey."[69]  This representation was "knowingly or recklessly false and misleading" because the MPT Entities allegedly "intended to and did work with Prime in its attempted acquisition of Christ Hospital" in Jersey City, New Jersey.[70]  According to the MPT Entities, they reasonably relied on this representation when deciding to enter into the Medical Center Transaction, and they have suffered damages as a result of this fraud.[71]

The MPT Entities seek judgment on the pleadings on this counterclaim on two grounds: (i) as barred by purported anti-reliance clauses in the Purchase and Sale Agreement and the Lease Agreement; and (ii) for failure to plead fraud with particularity under Court of Chancery Rule 9(b).[72]  In opposing this motion, the HUMC Entities assert that the integration clauses in the relevant agreements do not sufficiently disclaim reliance on representations outside the agreements to be deemed anti-reliance provisions.[73]  Moreover, to the extent that their claim was not alleged with particularity, the HUMC Entities stated in their answering brief that they "will move to amend their Counterclaim" to include an allegation reflecting additional information that they provided as an interrogatory answer.[74]

---

[69] Countercl. ¶ 13.  Prime is a private company that operates hospitals and medical facilities.
[70] *Id.* ¶ 65.
[71] *Id.* ¶¶ 66-67.
[72] Pls.' Reply Br. 6-13; Pls.' Opening Br. 17-22;
[73] Defs.' Answering Br. 6-9.
[74] *Id.* 10.

Rule 9(b) requires that "the circumstances constituting fraud . . . shall be stated with particularity." This particularity pleading standard governs claims for fraud in the inducement.[75] "The factual circumstances that must be stated with particularity refer to the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation."[76] More succinctly, this standard requires some "detail about what was actually said, who said it, where, [and] when."[77]

The HUMC Entities' conclusory allegations plainly do not satisfy the pleading standard of Rule 9(b). Among other reasons, the allegations do not state with particularity what misrepresentation was made, who made it, to whom it was made, and when and where it was made.

The HUMC Entities' stated intention to amend their Counterclaim does not cure this pleading deficiency. A motion to amend a pleading in response to a motion for judgment on the pleadings under Rule 12(c) is governed by Rule 15(a).[78] Rule 15(a) provides that leave of the Court to amend a pleading shall

---

[75] *See, e.g.*, *Anvil Hldg. Corp. v. Iron Acq. Co., Inc.*, 2013 WL 2249655, at *4-6 (Del. Ch. May 17, 2013).

[76] *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 207-08 (Del. Ch. 2006), *aff'd sub nom.*, *Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007) (TABLE).

[77] *See Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 142 (Del. Ch. 2009).

[78] The parties debated at oral argument whether a motion to amend a pleading in response to a Rule 12(c) motion is governed by Rule 15(a) or Rule 15(aaa). Tr. of Oral Arg. 54-56, 69, 73. Under the current Chancery Court Rules, Rule 15(aaa) does not reference Rule 12(c). *But see*

be "freely given when justice so requires." "A court will not grant a motion to amend, however, if the amendment would be futile. An amendment is futile if it would not survive a motion to dismiss . . . ."[79]

Assuming, without deciding, that the HUMC Entities' request is procedurally proper, the Court concludes that leave to amend should not be given because the amendment would be futile. The to-be-alleged interrogatory response states, in its entirety:

> The representation set forth in Paragraph 13 of the Counterclaim Complaint was made to Mr. Garipalli during one or two meetings with MPT personnel, which included Emmett McLean, Rosa Hooper, and Steve King. The meeting or meetings took place in the second half of 2010, at the very outset of the relationship between Defendants and Plaintiffs, before the parties had commenced working on the Bayonne Medical Center transaction [which took place before the Medical Center Transaction]. The representation was made to Mr. Garipalli by Mr. McLean, and/or Ms. Hooper, and/or Mr. King. The witnesses were Mr. Garipalli and Mr. McLean, and/or Ms. Hooper, and/or Mr. King.[80]

Any amended pleading based on this additional information would still not satisfy the particularity pleading standard of Rule 9(b). There would only be an allegation

---

*Braddock v. Zimmerman*, 906 A.2d 776, 783 (Del. 2006) ("Rule 15(aaa) was written to accomplish that objective by requiring plaintiffs, when confronted with a motion to dismiss pursuant to any of Ch. Ct. R. 12(b)(6), (c) or 23.1, to elect to either: stand on the complaint and answer the motion; or, to amend or seek leave to amend the complaint before the response to the motion was due."); *Taubenfeld v. Marriott Int'l, Inc.*, 2003 WL 22682323, at *2 (Del. Ch. Oct. 28, 2003) (quoting Rule 15(aaa) as governing a motion to amend in response to a Rule 12(c) motion).

[79] *Cartanza v. LeBeau*, 2006 WL 903541, at *2 (Del. Ch. Apr. 3, 2006).

[80] Pls.' Answering Br. 10 (quoting Defs.-Counterpls.' Resps. to Pls.' First Set of Interrogs. Directed to Defs. at Resp. to ¶ 9).

25

of a general statement made by one of three people at one or two meetings held at an undisclosed location at some point during a six-month period. If the representation was important enough to the HUMC Entities to rely on it when they decided to enter into the Medical Center Transaction with the MPT Entities, then it is not an inappropriate burden to require them to allege more—and with particularity—to state a claim for fraud under Rule 9(b).

Accordingly, any motion by the HUMC Entities to amend their pleading is denied, and the MPT Entities' Rule 12(c) motion to dismiss this claim is granted.[81]

## III. CONCLUSION

The MPT Entities are entitled to judgment on the pleadings dismissing the HUMC Entities' counterclaim for fraud in the inducement for failure to plead fraud with particularity under Rule 9(b). The MPT Entities' Rule 12(c) motion is otherwise denied. The HUMC Entities' Rule 12(c) motion is also denied.

**IT IS SO ORDERED**.

*/s/ John W. Noble*
Vice Chancellor

---

[81] Based on this conclusion, the Court need not determine whether this counterclaim is barred by the provisions of the Purchase and Sale Agreement or the Lease Agreement.